UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MB MARINE LLC and GOLDEN EAGLE,<br><br>Plaintiff,<br><br>v.<br><br>WIEHLE INDUSTRIES INC.,<br><br>Defendant. | CASE NO. 2:23-cv-513<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The Parties tried this matter in a bench trial on September 16, 2024, and they submitted supplemental briefing at the Court's request. Dkt. Nos. 42–44. The Court ENTERS the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiff MB Marine, LLC is an Alaska business that operates two charter vessels taking guests on multi-day cruises and hunting trips in Southeast Alaska. The vessel GOLDEN EAGLE, a 98-foot yacht, is owned by MB Marine and used for its charter operations.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

2. During the winter of 2022, Plaintiff brought the GOLDEN EAGLE into Stabbert Marine, an industrial shipyard in Seattle, Washington, to have a new pilothouse assembly constructed and installed on the vessel.

3. Stabbert Marine contacted Defendant Wiehle Industries, Inc. and arranged for certain trim and stain work to be done on the inside of the pilothouse. The work involved staining several pieces of trim that had been removed from the vessel and were in Stabbert's possession.

4. Before performing this work, a Stabbert employee and two Wiehle employees visited the GOLDEN EAGLE to discuss the stain work. They spoke with MB Marine's owner Keegan McCarthy. McCarthy did not know that Stabbert had contacted Wiehle to perform the stain work. He believed that the Wiehle employees present at the meeting were Stabbert employees.

5. During this meeting, McCarthy stated that he would pay between $2,500–$3,000 for the stain work. He clarified that the work could not exceed $4,000 because of budgetary constraints and that he did not want to go forward with the work if it cost more than $4,000.

6. Wiehle and Stabbert agreed that Wiehle would perform the stain work as a subcontractor. Wiehle's owner, Gabe Wiehle, testified that he did not have a contract with McCarthy or with MB Marine for the stain work.

7. Wiehle subcontracted the stain work. As MB Marine did not know that Wiehle was performing the work, it did not agree that Wiehle had authority to subcontract it.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

8. Wiehle billed MB Marine for $21,105.74 for the stain work. The bill reflected a 15–20 percent margin for Wiehle that MB Marine did not agree to.

9. During the winter of 2022, MB Marine contracted directly with Wiehle to fair and paint the new, aluminum pilothouse that Stabbert had installed on the GOLDEN EAGLE.

10. Weighing the evidence presented at trial, the Court finds the material terms of the oral contract were as follows:

    a. Wiehle would paint and fair the pilothouse to match the rest of the vessel as closely as possible. The Parties understood that an exact color-match was impossible, but there was an agreement that the color would be close.

    b. The fairing and paint finish on the pilothouse was to match the smooth, glossy finish of the rest of the vessel and have no weld marks or seams.

    c. Wiehle would perform the work on a time-and-materials basis.

    d. The work was to be performed before the GOLDEN EAGLE had to return to Alaska for a charter.

11. Wiehle painted the pilothouse but failed to produce the agreed-upon "yacht-quality" finish. Instead, the paint on the pilothouse was almost matte, covered in thousands of small uneven bubbles, and had an "orange peel" or "stippled" effect. The finish on the pilothouse did not match the rest of the boat. The paint chipped off easily in certain places, and

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

McCarthy had to instruct his employees to be careful when cleaning the pilothouse so as not to accidentally chip off the paint. In sum, MB Marine did not receive what the Parties had agreed upon.

12. As for the paintjob, Gabe Wiehle testified that he had spoken with McCarthy many times about limitations on the project. He testified that Wiehle could not spray the paint on and would instead have to roll it on because of logistical, environmental, and time constraints. Gabe Wiehle testified that McCarthy understood that the paintjob would be affected by these constrains and by the rolling method, and that MB Marine should have known that the paintjob would look as it did. Gabe Wiehle also testified that Wiehle had kept MB Marine well-informed of its painting process, and that MB Marine knowingly agreed to the finish that Wiehle produced.

13. McCarthy testified that these conversations between MB Marine and Wiehle never occurred, and that MB Marine never agreed to modify the scope or conditions of the job. He testified that Wiehle never informed MB Marine of constraints that would affect the finish of the pilothouse paint, nor did Wiehle inform MB Marine that it planned to roll the paint on rather than spray it on.

14. The Court evaluates the credibility of McCarthy's testimony against the credibility of Gabe Wiehle's testimony to resolve the factual disputes about the agreed-upon scope and quality of the job. To that end, the Court finds that McCarthy's testimony was more credible and more persuasive.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

Plaintiff's counsel successfully impeached Gabe Wiehle multiple times while cross-examining him on the topics of paint quality and communications between Wiehle and MB Marine. Further, Gabe Wiehle's testimony was considerably vague on these topics. While he repeatedly said that he (and/or potentially other Wiehle agents) spoke with MB Marine, he often could not recall when those conversations occurred, or who they were with. The Court also finds his testimony less credible because he testified in an evasive and argumentative way; he often refused to answer the question posed.

15. Wiehle billed MB Marine $25,347.50 for the painting and fairing work.

16. McCarthy immediately complained about the paintjob to an agent or employee of Stabbert. MB Marine refused to pay Wiehle for the work because of the work's poor quality.

17. Because the bubbling paint that Wiehle applied could not simply be painted over, MB Marine had to hire another company to scrape the paint off before repainting it. It hired Triton Marine Details LLC and paid $53,785 to remove the peeling paint and repaint the vessel.

18. MB Marine tried to pay $4,000 to Wiehle by check for the stain work, but Wiehle refused the payment.

19. Wiehle filed a maritime lien on the GOLDEN EAGLE in the amount of $46,453.24.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5

## II. CONCLUSIONS OF LAW

20. The Court has jurisdiction over this matter under 28 U.S.C. § 1333, which provides district courts with original jurisdiction over admiralty and maritime cases.

21. The parties assert contract and quasi-contract claims. The burden of proof on each is a preponderance of the evidence.

    a. Wiehle asserts that MB Marine breached the Parties' oral contract by failing to pay the amount owed for completed work on the vessel.

    b. MB Marine asserts that Wiehle breached the implied warranty of workmanlike performance ("WWLP") on the contract by performing a sub-standard paintjob. Dkt. No. 1 at 3 ("Plaintiff's request that this Court enter a judgment that the paintjob on the exterior of the vessel's house performed by Wiehle is substandard and was not performed in a workman-like manner.").

22. The contract at issue is a maritime contract. *See S/Y Paliador, LLC v. Platypus Marine, Inc.*, Case No. 3:22-cv-05591-LK, 2024 WL 4277855, at *6 (W.D. Wash. Sept. 14, 2024) (King, J.) (quoting *W. Towboat Co. v. Vigor Marine*, LLC, 544 F. Supp. 3d 1100, 1116 (W.D. Wash. 2021 ("A contract that relates to a ship, to commerce or navigation on navigable waters, or to maritime employment is a maritime contract.")). Thus, the Court applies the general maritime law, filling in the gaps with non-conflicting Washington-state contract law. *Id.* at *7 (explaining that "[s]tate law may supplement federal maritime law" in maritime contract disputes).

    a. To prove breach of a maritime contract, the plaintiff must prove: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Id.* at *11 (internal quotations and citations omitted).

    b. A party to a maritime contract may breach it by breaching the implied WWLP, which "requires a contractor to make ship repairs in a skilled and workmanlike manner." *Prowler, LLC v. York Int'l Corp.*, No. 06-cv-660-JLR, 2007 WL 2363046, at *5 (W.D. Wash. Aug. 14, 2007) (citing *H & H Ship Serv. Co. v. Weyerhaeuser Line*, 382 F.2d 711, 712 (9th Cir. 1967)). The warranty of workmanlike performance is part of every ship repair contract. *H & H Ship Serv. Co.*, 382 F.2d at 712.

    c. "In order to prevail on its implied WWLP claim," MB Marine must show that Wiehle "failed to use the degree of diligence, attention, and skill adequate to complete the task, and that it suffered damages as a result." *See id.*

23. The Court concludes that the Parties had an oral contract for the painting and fairing work, and the terms of the contract are the same as stated above in the Court's findings of fact. "[O]ral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961)

24. Wiehle breached the maritime contract by failing to perform the work in a workmanlike manner. Specifically, Wiehle breached the implied warranty of workman like performance in the following significant ways:

    a. Applying paint over uncured layers, resulting in thousands of bubbles, as evidenced by expert testimony about "solvent pop";

    b. Producing a finish with roller stipple/orange peel effect inconsistent with yacht quality standards and the existing finish on the vessel;

    c. Failing to adequately inform the owner of the specific limitations and expected appearance of the finished product.

    These failures demonstrate that Wiehle did not use an adequate degree of diligence, attention, and skill to complete the task. *See Prowler*, 2007 WL 2363046, at *5.

25. Section 347 of the *Restatement (second) of Contracts* sets out the appropriate "Measure of Damages" here. *See Crowley Marine Servs. v. Vigor Marine LLC*, 17 F. Supp. 3d 1091, 1097–98 (W.D. Wash. 2014). Thus, MB Marine is entitled to the following contract damages: "(a) the loss in the value . . . [of Wiehle's] performance caused by [Wiehle's] failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *Restatement (second) of Contracts*, § 347; *see also Crowley Marine Servs.*, 17 F. Supp. 3d at 1097).

    a. Because the work had to be completely redone, the loss in value of Wiehle's performance is the full value of a workmanlike paintjob on

      the GOLDEN EAGLE's pilothouse. *See Restatement (second) of Contracts*, § 347(a); *id.* cmt. b. ("Loss in value."). MB Marine's consequential damages include the costs associated with removing the paint that Wiehle applied so that the work could be redone. *See id.*, cmt. c. ("Other loss.") ("Consequential losses include such items as injury to person or property resulting from defective performance."). Finally, because MB Marine did not pay Wiehle for the fairing and paint work, it avoided the cost of performance in the amount of $25,347.50. *See id.*, § 347(c).

   b. MB Marine paid Triton Marine Details LLC $53,785 to remove the paint that Wiehle had applied and to properly re-fair and re-paint the GOLDEN EAGLE's pilothouse. The Court finds that this amount encompasses both MB Marine's lost value on the contract and its consequential damages. Accordingly, MB Marine's damages are $53,785, less $25,347.50, which is $28,437.50.

26. Because the Parties had a contract for the GOLDEN EAGLE'S painting and fairing, the Court does not consider the quasi-contract theories of recovery that Wiehle raises as applied to the painting and fairing. These include quantum meruit and promissory estoppel.

27. Wiehle failed to establish that there was a time-and-materials agreement between MB Marine and Wiehle for the stain work on the GOLDEN EAGLE. Rather, the evidence shows that MB Marine offered to pay no more than $4,000 for the stain work.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

28. Wiehle's subcontracting of the stain work without MB Marine's knowledge or consent is significant, as maritime law generally requires a direct relationship between the vessel and service provider to establish either contractual or quasi-contractual rights. *Farwest Steel Corp. v. Barge Sea Span 241*, 769 F.2d 620, 624 (9th Cir. 1985).

29. Because Wiehle has failed to establish that there was an express contract between the Parties, the Court evaluates Wiehle's quantum meruit claim, using Washington law.

30. Quantum meruit "is the method of recovering the reasonable value of services provided under a contract implied in fact." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008) (en banc). "[T]he elements of a contract implied in fact are: (1) the defendant requests work, (2) the plaintiff expects payment for the work, and (3) the defendant knows or should know the plaintiff expects payment for the work." *Id.* at 1263.

31. As for the stain work, the Parties agree that MB Marine requested it, and Wiehle expected to be paid for it.

32. Wiehle did not establish the reasonable value of the stain work during the trial. Nevertheless, MB Marine conceded that it should pay Wiehle $4,000 for the work performed. Given this concession, the Court finds for Wiehle on its quantum meruit claim in the amount of $4,000.

33. Wiehle also raises a promissory estoppel claim, arguing that it is entitled to equitable relief. Again, the Court applies Washington law. The

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

Washington Pattern Instruction for Promissory Estoppel, edited appropriately for the specific facts of this case, provides:

> Promissory estoppel means that a person will be prevented (estopped) from denying liability for breaching his or her promise, when another person reasonably relied upon that promise and justice requires that the promise be enforced.
>
> Wiehle claims promissory estoppel and has the burden of proving, by a preponderance of the evidence, each of the following:
>
> (1) That MB Marine promised to pay for the stain work on a time and materials basis without a limitation of $4,000;
>
> (2) That MB Marine should have reasonably expected that promise to cause Wiehle to change position by spending more than $4,000 to complete the stain work;
>
> (3) That Wiehle actually did change position; and
>
> (4) That when Wiehle changed position, it was relying on the promise of MB Marine, and was justified in doing so; and
>
> (5) That injustice can be avoided only if the promise is enforced.

*See* 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 301A.01 (7th ed.).

34. Because Wiehle established none of these prongs, the Court finds for MB Marine on Wiehle's promissory estoppel claim.

35. Wiehle's claim for breach of the implied covenant of good faith and fair dealing also fails for lack of proof.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

36. Plaintiff requests declaratory judgment that the GOLDEN EAGLE is not subject to the maritime lien that Wiehle filed. The Court applies Subchapter III of the Commercial Instrument and Maritime Lien Act (CIMLA), 46 U.S.C. §31341 et seq. Under CIMLA, a party may claim that its vessel is not subject to a recorded lien, and "the district courts of the United States shall have jurisdiction over" such an action "in Admiralty to declare that a vessel is not subject to [the] lien claimed." 46 U.S.C. § 31343(c)(2).

37. To establish a valid maritime lien for necessaries, a service provider must show: "'(1) that the goods or services were provided to the vessel; (2) that the goods or services were 'necessaries'; (3) that the charges are reasonable in amount; and (4) that they were ordered by someone with the appropriate authority.'" *Shugart v. GYPSY Off. No. 251715*, 2016 WL 51407, at *5 (W.D. Wash. 2016) (quoting *Richmond Bay Marina, LLC v. Vessel "Relax,"* 2013 U.S. Dist. LEXIS 179132, *14, 2013 WL 6699976 (N.D. Cal. Dec. 19, 2013)). "Necessaries" are "anything that facilitates or enables a vessel to perform its mission or occupation." *Id.* (citing *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 923 (9th Cir. 2002)).

38. Wiehle's maritime lien fails the third element of reasonableness. The stain work significantly exceeded the agreed-upon price limitation of $4,000, and the paint work was defectively performed. Thus, the lien as filed for $46,453.24 is not valid.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12

39. Given the Court's findings on the Parties' contract claims, the GOLDEN EAGLE is not subject to the maritime lien against it that Wiehle Industries Inc. established on April 20, 2022.

40. Under 46 U.S.C. § 31343(c)(2), "the prevailing party is entitled to recover the costs of the action and attorney fees unless the court finds that the position of the other party was substantially justified or other circumstances make an award of costs and attorney fees unjust." The Parties did not argue attorneys' fees during trial, so the Court does not address the issue now. The Parties may opt to file motions on the issue but must do so within 14 days of this order.

41. MB Marine is entitled to prejudgment interest on its award of $28,437.50. In admiralty cases, "prejudgment interest must be granted unless peculiar circumstances justify its denial." *Navigators Mgmt. Co., Inc. v. IMC Shipping China Co.*, No. LACV2301204JAKMARX, 2023 WL 8939214, at *9 (C.D. Cal. Nov. 7, 2023) (quoting *Haney v. Blake*, 794 Fed. App'x 582, 584 (9th Cir. Nov. 21, 2019)); *see also* W. Pac. Fisheries, Inc. v. SS President Grant, 730 F.2d 1280, 1288–89 (9th Cir. 1984) ("We conclude that the measure of interest rates prescribed for post-judgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest in [admiralty] cases . . . unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate."). The Court finds no exceptional circumstances that would

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13

warrant denial of prejudgment interest or deviation from the standard interest rate here.

### III. CONCLUSION

For the reasons above, the Court finds for MB Marine in the amount of $28,437.50, plus prejudgment interest. The Court further finds that the GOLDEN EAGLE is not subject to the lien asserted by Wiehle. MB Marine must pay Wiehle $4,000 for the stain work performed. Offsetting these amounts, Wiehle must pay MB Marine $24,437.50, plus prejudgment and post-judgment interest. Accordingly, the Court DIRECTS the Clerk of the Court to ENTER JUDGMENT in MB Marine's favor.

Dated this 9th day of May, 2025.

Jamal N. Whitehead
United States District Judge